UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANTHONY HENSEL,

                              Plaintiff,

          -against-                                    6:15-CV-0374 (LEK/TWD)

CITY OF UTICA,

                              Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Pro se plaintiff Anthony Hensel has brought this action against his former employer, the

City of Utica (the "City" or "Utica"), alleging violations of the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.*,[1] and Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e, *et seq.*, stemming from the denial of his disability benefits and

subsequent termination of his employment as a Utica police officer. Dkt. No. 22 ("Amended

Complaint"). Now before the Court is Utica's motion for summary judgment, filed pursuant to

Federal Rule of Civil Procedure 56. Dkt. Nos. 135 ("Motion"); 135-16 ("Defendant's Statement

of Material Facts" or "Defendant's SMF"); 135-17 ("Defendant's Memorandum"). Plaintiff

opposes this Motion, Dkt. Nos. 154 ("Plaintiff's Response to Defendant's SMF" and "Plaintiff's

SMF"); 154-2 ("Opposition"), to which Defendant replies, Dkt. No. 162 ("Reply"). For the

following reasons, the Court denies Defendant's Motion.

_____

[1] As modified by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §
12102(1)–(2), which "substantially broadened the definition of a disability under the law."
Anderson v. Nat'l Grid, PLC, 93 F. Supp. 3d 120, 131 (E.D.N.Y. 2015).

## II.    BACKGROUND

### A.  Facts

The following facts are taken from the parties' Statements of Material Facts, as well as the underlying evidence submitted by the parties' in connection with Defendant's Motion.[2] Except where noted, the following facts are largely undisputed.

In 2003, Plaintiff joined the Utica Police Department ("UPD") as a police officer. Def.'s SMF ¶ 1; Dkt. No. 135-3 ("First Hensel Deposition") at 34, 68. Plaintiff worked as a patrol officer in various parts of Utica for the next few years. First Hensel Dep. at 69, 71–74.

On March 9, 2008, Plaintiff slipped and fell while investigating a burglary, injuring his back and neck. Def.'s SMF ¶ 2; First Hensel Dep. at 79–82. Plaintiff received treatment for his injuries from several doctors, including Dr. Rudolph Buckley, an orthopedist. Id. at 85. Dr. Buckley ordered an MRI that revealed several herniated discs in Plaintiff's back. Id. at 86. In June 2008, as a result of these injuries, Plaintiff was placed on paid medical leave under New York General Municipal Law § 207-c.[3] Def.'s SMF ¶ 2; First Hensel Dep. at 87; Dkt. No. 154-1, Ex. 1 ("Hensel Affidavit") at 1.[4] Plaintiff remained on § 207-c until June 2009, when he returned

---

[2]  According to N.D.N.Y. Local Rule 7.1(a)(3), a party opposing a summary judgment motion must "file a response to the [moving party's] Statement of Material Facts" that "shall mirror the movant's Statement of Material Facts" and "admit[] []or deny[] each of the movant's assertions." N.D.N.Y. L.R. 7.1. Any denials must be specific and must be supported by a citation to the record. Id. Though Plaintiff denies numerous assertions within Defendant's SMF, the Court nonetheless cites to the SMF where Plaintiff has not "specifically controverted" a particular fact in a given paragraph or supported his denial with a record cite. Id.

[3]  "New York General Municipal Law § 207-c provides that a municipality must pay for necessary medical treatment by reason of a municipal police officer's work-related injury." Hensel v. City of Utica, No. 15-CV-374, 2016 WL 1069673, at *1 (N.D.N.Y. Mar. 16, 2016) (citing N.Y. Gen. Mun. Law § 207-c).

[4]  Plaintiff submitted the Hensel Affidavit in support of his Opposition to Defendant's Motion for summary judgment. Defendant objects that this affidavit was "tailor made . . . to contradict [Plaintiff's] deposition testimony" and urges the Court to "reject the affidavit as a

to work in a light duty role and was stationed in the radio room. First Hensel Dep. at 88, 90; Hensel Aff. at 1. By September 2009, he was back on unrestricted duty. First Hensel Dep. at 88–89; Hensel Aff. at 1.

Even after returning to full duty, Plaintiff still experienced intermittent back and neck pain, and at times would ask to be posted back in the radio room, or even to leave work early. First Hensel Dep. at 89–91. While some supervisors, such as former Lieutenant Grace Pruitt, would accommodate these requests, others would not. Dkt. No. 154-1, Ex. 6 ("Pruitt Affidavit") at 1; Hensel Aff. at 3–4.

In late 2009, Plaintiff started experiencing other symptoms unrelated to his neck and back pain. First Hensel Dep. at 94. Eventually, in December 2009, he was diagnosed with diabetes. Id. at 96. Efforts to get his diabetes under control kept him out of work from December 2009 to July 2010. Id. at 108–09; Hensel Aff. at 2; Def.'s SMF ¶ 3. Once Plaintiff returned to duty, he requested a patrol location close to the police station, so that he could come inside periodically to check his blood sugar, eat, use the bathroom, or take a break. First Hensel Dep. at 74, 107–09. While Lieutenant Pruitt once again accommodated these requests, other supervisors did not. Id. at 74, 107–08; Pruitt Aff. at 1.

---

sham." Reply at 1 (citing Raskin v. Wyatt Co., 125 F.3d 55, 63 (2d Cir. 1997) ("a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony.")). While Defendant is correct that a court can disregard affidavits crafted specifically to controvert an opponent's summary judgment motion, the Court does not view the entire Hensel Affidavit as a sham and will not disregard it in its entirety. Much of the Hensel Affidavit accords with the rest of the record, including Plaintiff's deposition. Therefore, following the practice of other courts in this Circuit, the Court will disregard the Hensel Affidavit where it conflicts with other evidence in the record, but consider it where there is no conflict. See Wallen v. Teknavo Grp., No. 12-CV-6196, 2019 WL 1435879, at *3 (E.D.N.Y. Mar. 30, 2019) (disregarding "Plaintiff's statements in the declaration in opposition to summary judgment that contradict [his] deposition testimony.").

On March 14, 2011, while on duty and driving to the scene of an accident, Plaintiff was involved in a car crash. Def.'s SMF ¶ 4; First Hensel Dep. at 110–12; Hensel Aff. at 4. According to Plaintiff, this crash aggravated his injuries from the 2008 fall. First Hensel Dep. at 120–22, 125; Hensel Aff. at 4–6. Over the next several months, as he attempted to work through the pain, Plaintiff regularly requested to work inside, at times threatening to go home if his request was not granted. First Hensel Dep. at 124–25. Then, on January 19, 2012 Plaintiff sent a letter to UPD Chief Mark Williams requesting an appointment with the police surgeon. Dkt. No. 135-6, Ex. 3 ("January 19, 2012 Letter"). In this same letter, Plaintiff reminded Chief Williams of his March 2008 "permanent injury" and stated that the pain from that injury had been getting worse. Id.

As a result of this letter, on January 23, 2012, Plaintiff had an appointment with Dr. Timothy LaFont, the police surgeon. Id. at 131; Dkt. No. 135-6, Ex. 13 ("LaFont Report"). At this appointment, Plaintiff claimed he had "pain everywhere," "always ha[d] . . . since his injury," and could not "stand or sit for more than about five minutes." Id. During the examination, Dr. LaFont told Plaintiff either "I don't know how you can work at all anymore," or "I don't know how you can work at all right now." First Hensel Dep. at 131, 134.[5] After receiving the results of Dr. LaFont's exam, a fellow officer called Plaintiff and told him that he was "out injured." Id.

Over the course of the next few months, Plaintiff visited several other doctors for his conditions. For example, on May 21, 2012, Plaintiff met again with Dr. Buckley, who opined that Plaintiff's "disability status [was] 50% to 75% overall." Dkt. No. 136-7, Ex. 20. Also, on

---

[5] Plaintiff reported Dr. LaFont's words differently in two separate places in his deposition.

June 10, 2012, Plaintiff saw Dr. Sudershan Dang, who opined that Plaintiff's level of "temporary impairment" was 100%, Dkt. No. 135-6, Ex. 15. The City apparently had decided to treat the January 19, 2012 Letter as an application for § 207-c benefits, as it paid all of Plaintiff's medical bills in connection with these doctors' visits. First Hensel Dep. at 133–35; Def.'s SMF ¶ 7.

In connection with this putative § 207-c application, the City requested that Plaintiff attend an Independent Medical Exam with Dr. Daniel Carr. Def.'s SMF ¶ 9; First Hensel Dep. at 136. Plaintiff met with Dr. Carr on April 2, 2012, after which Dr. Carr issued a report of his examination. Def.'s SMF ¶ 9. In his report, Dr. Carr found that "there [was] no clinical correlation between [Plaintiff's neck and back] symptoms and [his] [March 2008] injury." Dkt. No. 135-15 ("April 16, 2012 Letter"); see also Dkt. No. 135-6, Ex. 7 ("Hearing Report") at 10 (stating that Dr. Carr "could not, . . . with a reasonable degree of medical certainty, place the cause of [Plaintiff's] disc disease on the incident of March 9, 2008."). Dr. Carr also noted that there was "no medical contraindication for [Plaintiff] working full duty without restrictions as a police officer." Id.; see also Hearing Report at 10 ("Dr. Carr opined that . . . Officer Hensel could return to work without restrictions as a police officer.").

As a result of this report, on April 16, 2012, Captain Michael Bailey issued a letter to Plaintiff informing him that "no further [§ 207-c] benefits w[ould] be provided to [him] as a result of the [March 2008] incident." Def.'s SMF ¶ 10; April 16, 2012 Letter. Additionally, the April 16, 2012 Letter reassigned Plaintiff from the "Logistics and Resources Unit" back to a "full-duty" patrol squad and ordered him to report for work the following day. Id. Plaintiff apparently never received the April 16, 2012 Letter, as he was "out of town" that week. First Hensel Dep. at 139. Instead, on April 17, 2012, Plaintiff received a phone call from a fellow officer who advised him about the April 16, 2012 Letter. Hensel Aff. at 7. That same day, April

17, 2012, Plaintiff called the UPD and spoke with Lieutenant Lori Cozza of the logistics unit, who informed Plaintiff about the contents of the Letter. First Hensel Dep. at 138–39; Hensel Aff. at 7. Cozza also told Plaintiff that he was "off the payroll and AWOL," even though another officer in the logistics unit had previously told Plaintiff that he was "out injured . . . on 207-c." Id. at 139. A few days later, Plaintiff spoke with Captain Bailey on the phone. Id. at 144. Bailey advised Plaintiff about the April 16, 2012 Letter and told him to come back to town so they could discuss. Id. at 144–45. However, when Plaintiff returned home, he never reported to work. Def.'s SMF ¶ 11; First Hensel Dep. at 148. According to Plaintiff, this was "on the advice of counsel" and because he "was never medically cleared to return to work." Id. at 148–50.

Plaintiff then hired an attorney. First Hensel Dep. at 145. On June 19, 2012, Plaintiff's attorney sent a letter to Utica officials in which he decried Defendant's "wrongful" termination of Plaintiff's § 207-c benefits and demanded a "due process hearing with regard to Officer Hensel's § 207-c benefits and with regard to his ability to work a light-duty assignment. Dkt. No. 135-6, Ex. 6; Def.'s SMF ¶ 12. In response to this demand, the City organized a hearing to "determine whether or not . . . Officer Anthony Hensel [was] disabled from performing the regular duties of a police officer for the City of Utica as a result of an accident that occurred on March 9, 2008." Hearing Report at 14. Commissioner of Public Safety Robert Palmieri appointed Andrew Lalonde as hearing officer and Lalonde convened two hearings, one on August 27, 2012 and the second on October 2, 2012 (the "§ 207-c Hearings"). Id. at 2. After reviewing the medical and testimonial evidence, on February 25, 2013 Lalonde found that "Officer Hensel[] [was] physically able to perform the duties of his position as a police officer." Id. at 21. Based on this finding, Lalonde denied Plaintiff's petition for § 207-c benefits. Id.

On June 18, 2013,[6] Plaintiff filed an Article 78[7] Petition in Oneida County Supreme Court, challenging Lalonde's determination that Plaintiff was capable of unrestricted duty and did not merit § 207-c benefits. Def.'s SMF ¶ 15. On August 19, 2013, the Oneida County Supreme Court transferred Plaintiff's Article 78 Petition to the Appellate Division, Fourth Department for substantial evidence review. Def.'s SMF ¶ 16; Dkt. No. 135-6, Ex. 8 ("Fourth Department Decision"). On March 21, 2014, the Fourth Department affirmed Lalonde's decision—ruling that it was supported by substantial evidence—and dismissed Plaintiff's Article 78 Petition. Fourth Department Decision; Def.'s SMF ¶ 17.

Then, on April 7, 2014, the City sent Plaintiff a letter in which it announced its intention to terminate Plaintiff's employment under New York State Civil Service Law § 73.[8] Dkt. No. 135-10 ("April 7, 2014 Letter"). This letter, signed by Lori Wrobel of the Civil Service Commission and copied to UPD Chief Mark Williams, stated that Plaintiff was to be fired because he had "been continuously absent from [his] employment with the City of Utica for a period well in excess of one year, as a result of disability, other than a disability arising from

---

[6] Though this date is not found in the record, the Court takes judicial notice of the date from the state court docket. See Hensel v. City of Utica, 1301219/2013, Dkt. No. 1 (Filed June 18, 2013); see also Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings.").

[7] "Article 78 of New York's Civil Practice Law and Rules establishes a state mechanism for judicial review of administrative action." Casale v. Metro. Transp. Auth., No. 05-CV-4232, 2005 WL 3466405, at *1 (S.D.N.Y. Dec. 19, 2005); see also N.Y. C.P.L.R. 7801–06 ("Article 78").

[8] "New York Civil Service Law § 73 authorizes the termination and replacement of civil servants who, by reason of a disability, have been continuously absent from and unable to perform the duties of their prior position for one year or more." White v. Elmhurst Hosp., No. 06-CV-1128, 2009 WL 10706042, at *12 (E.D.N.Y. Mar. 31, 2009); see also N.Y. Civ. Serv. Law § 73.

occupational injury or disease as defined by law." Id. The letter also informed Plaintiff that he

had until April 15, 2014 to "submit further medical evidence . . . which may establish [his]

fitness to perform all the duties of a Utica Police Officer," and that if he did so he would not be

terminated. Id. Finally, the letter explained that if Plaintiff were eventually terminated, he had the

right under Civil Service Law § 73 to apply for reinstatement within one year of the end of his

disability. Id. Plaintiff did not submit any medical evidence to the City, instead turning the letter

over to his lawyer. First Hensel Dep. at 184–85; Def.'s SMF ¶ 22. Nor did Plaintiff ever attempt

to show up for work. First Hensel Dep. at 189.

On April 29, 2014, Plaintiff filed a motion for leave to appeal the Fourth Department's

decision dismissing his Article 78 Petition to the New York Court of Appeals. Def.'s SMF ¶ 41;

see also Dkt. No. 135-14 ("Appeal Motion"). He mailed notice of the Appeal Motion to the City

the next day. Def.'s SMF ¶ 42; Dkt. No. 154-1, Ex. 5 ("Postage Documents"). The City received

this notice on the morning of May 1, 2014. Id. That same day, because Plaintiff had "provided no

response to [the April 7, 2014 Letter]," UPD Chief Williams signed a letter terminating

Plaintiff's employment "effective immediately." Dkt No. 135-11 ("May 1, 2014 Letter").

Plaintiff received the May 1, 2014 Letter around 6:00 PM that same evening. First Hensel Dep.

at 196. According to Chief Williams, at the time he signed the May 1 Letter, he had no

knowledge that Plaintiff had filed his Appeal Motion. Dkt. No. 135-13 ("Williams Affidavit")

¶ 6.

The next day, Plaintiff called Lori Wrobel at the Civil Service Commission. Hensel Aff.

at 13. In response to his inquiries about his job, Wrobel apparently told Plaintiff that he was

"gone." Hensel Aff. at 13. Plaintiff then turned the May 1, 2014 Letter over to his attorney as

well. First Hensel Depo at 197. He did not apply for reinstatement under Civil Service Law § 73. Id.

On July 1, 2014, the Court of Appeals denied Plaintiff's Appeal Motion. Dkt. No. 135-6, Ex. 12. Plaintiff then filed a complaint with the EEOC on September 15, 2014. Dkt. No. 135-7, Ex. 36. On October 30, 2014, the EEOC sent Plaintiff a letter informing him that it declined to investigate his complaint. Dkt. No. 135-7, Ex. 38. Plaintiff then filed a formal charge against Defendant, which the EEOC denied on December 30, 2014. Dkt. No. 135-7, Ex. 39. With that denial, Plaintiff had exhausted his administrative remedies and received a right to sue letter. Id.; see also Dkt. No. 154-1, Ex. 4.

**B. Procedural History**

On March 30, 2015, Plaintiff, represented by counsel, filed suit in this court. Dkt. No. 1 ("Complaint"). On May 21, 2015, Defendant moved to dismiss under Federal Rule of Civil Procedure ("FRCP") 12(b)(1) for lack of subject matter jurisdiction and FRCP 12(b)(6) for failure to state a claim. Dkt. No. 9 ("First Motion to Dismiss"). The Court rejected Defendant's jurisdictional arguments but dismissed Plaintiff's complaint for failing to state a claim. Dkt. No. 19 ("March 16, 2016 Order"); see also Hensel v. City of Utica, No. 15-CV-374, 2016 WL 1069673 (N.D.N.Y. Mar. 16, 2016). However, the Court also granted Plaintiff leave to replead, Mar. 16, 2016 Order at 22, which he did on April 7, 2016, see Am. Compl.

Defendant then filed a second motion to dismiss under FRCP 12(b)(6) on April 21, 2016. Dkt. No. 23 ("Second Motion to Dismiss"). On June 8, 2016, after receiving several extensions, Plaintiff—through his attorney—responded to the Second Motion to Dismiss. Dkt. No. 30; see also Dkt. Nos. 27; 29 (granting Plaintiff's extension requests). Then, on December 27, 2016, before the Court could rule on the Second Motion to Dismiss, Plaintiff's attorney filed a motion

to withdraw as counsel. Dkt. No. 36 ("Motion to Withdraw"). After the time for responding to the Motion to Withdraw had expired, Plaintiff filed a late response stating that he did not object to his attorney's withdrawal and intended to proceed pro se. Dkt. No. 45. The Court then granted the Motion to Withdraw. Dkt. No. 48 ("February 2016 Text Order").

After granting the Motion to Withdraw, the Court granted Plaintiff sixty days in which to file a further response to the Second Motion to Dismiss. Feb. 2016 Text Order. Plaintiff, however, requested an additional 60-day extension, which the Court granted. Dkt. Nos. 49, 50. Plaintiff finally submitted his further response on May 8, 2017. Dkt. No. 51. The Court then denied Defendant's Second Motion to Dismiss on June 4, 2017. Dkt. No. 52 ("June 14, 2017 Order"); see also Hensel v. City of Utica, No. 15-CV-374, 2017 WL 2589355 (N.D.N.Y. June 14, 2017).

After discovery closed, Defendant filed the instant Motion for summary judgment on December 17, 2018. See Docket. Over the next several months, Plaintiff requested three extensions—two for sixty days and one for twenty days—of the deadline to file his opposition, see Dkt. Nos. 138, 143, 146, all of which the Court granted, see Dkt. Nos. 139, 144, 148. On April 29, 2019, the last day before his thrice-extended deadline expired, Plaintiff submitted only his Response to Defendant's Statement of Material Facts and an additional extension request of one day so he could "work to repair [his] printer." Dkt. Nos. 149, 150. The next day, Plaintiff filed his complete Opposition. See Docket. Although Plaintiff had already "received several, unusually long extensions of the deadline to file his" Opposition, because Plaintiff's Opposition was only one day late and the tardiness did not seriously prejudice Defendant, the Court accepted the late filing. Dkt. No. 155 ("May 1, 2019 Text Order").

Three days later, on May 3, 2019, Plaintiff resubmitted his Opposition papers. Dkt. No. 158 ("Resubmitted Opposition"). In a covering letter, Plaintiff explained the extenuating circumstances that had caused him to miss the April 29, 2019 filing deadline, and he expressed that he was "distressed by the work product he [had] submitted [three days before], as there [were] typographical/ grammatical errors, and [he] noticed that [he had] mixed up the order of . . . the exhibits." Id. To "avoid any confusion," Plaintiff was resubmitting "a more legible copy" of his Opposition papers that "adjusts for clerical errors and ensures the proper order of exhibits." Id. Though he claimed not to have made "any substantive changes," Plaintiff did include an additional affidavit that he had forgotten to submit the first time. Id.

Because the Court already granted Plaintiff several long extensions, the Court declines to consider the Resubmitted Opposition, which was filed without leave of court. In preparing this Memorandum-Decision and Order, the Court has relied solely on the arguments and evidence submitted with Plaintiff's original Opposition.

### III. LEGAL STANDARD

A court may grant a motion for summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted."). "The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will

demonstrate the absence of a genuine issue of material fact." Doe v. Patrick, No. 17-CV-846, 2020 WL 529840, at *6 (N.D.N.Y. Feb. 3, 2020) (Kahn, J.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "Similarly, a party is entitled to summary judgment when the nonmoving party has failed 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Id. at *6 (quoting Celotex, 477 U.S. at 322).

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Thus, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'" Kampfer v. Argotsinger, No. 18-CV-7, 2020 WL 906274, at *4 (N.D.N.Y. Feb. 25, 2020) (Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

## IV. DISCUSSION

The Court first addresses Plaintiff's claims under the ADA, then his Title VII claims.

### A. ADA Claims

Congress enacted the ADA, in part, "to address the major areas of discrimination faced day-to-day by people with disabilities." 42 U.S.C. § 12101(b)(4). "Within the workplace, the ADA prohibits discrimination against an otherwise qualified employee on the basis of her disability." Weiss v. Cty. of Suffolk, 416 F. Supp. 3d 208, 212 (E.D.N.Y. 2018) (internal

quotation marks omitted); see also 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment.").

As the Court recognized in its March 16, 2016 Order, Plaintiff's "Complaint d[id] not specifically articulate which [of several possible] causes of action Plaintiff intends to assert under the ADA." Mar. 16, 2016 Order at 5 n.6; see also Fulton v. Goord, 591 F.3d 37, 43 (2d Cir. 2009) (describing various kinds of ADA claims). The Amended Complaint—filed after that decision and by counsel—failed to clarify, as its structure largely mirrored that of the Complaint, compare Compl. with Am. Compl., and this Court did not construe the claims in its June 14, 2017 Order, see Hensel, 2017 WL 2589355. In the face of this turbidity, the Court now construes the Amended Complaint to raise the following ADA claims: (1) intentional discrimination through discriminatory discharge; (2) failure to make reasonable accommodation; (3) retaliation. Defendant has moved for summary judgment on each of these claims. Def.'s Mem. at 1. The Court addresses each claim, in turn.

### 1. Intentional Discrimination – Discriminatory Discharge

"Claims alleging intentional discrimination in violation of the ADA are subject to the burden-shifting analysis established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)," McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013), in which the initial burden is on the plaintiff to establish a prima facie case of discrimination, Sista v. CDC Ixis N. Am., Inc., 445 F.3d 161, 169 (2d Cir. 2006). To establish a prima facie case of disability discrimination under the ADA, the plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse employment action because of his disability."
Petrone v. Hampton Bays Union Free Sch. Dist., 568 F. App'x 5, 7 (2d Cir. 2014). "The burden
on a plaintiff to establish a prima facie case is de minimis." Umanzor v. New York City Police
Dep't, No. 14-CV-9850, 2018 WL 840084, at *4 (S.D.N.Y. Feb. 12, 2018).

In its Motion, Defendant challenges only the third element of Plaintiff's prima facie case,
arguing that Plaintiff has failed to raise a triable issue of fact as to whether he is "otherwise
qualified to perform the essential functions of a [Utica] police officer." Def.'s Mem. at 2. The
Court therefore addresses only this element here. See Preuss v. Kolmar Labs., Inc., 970 F. Supp.
2d 171, 188 (S.D.N.Y. 2013) (analyzing only the elements of the plaintiff's prima facie case that
defendant challenged in its summary judgment motion). It appears to be undisputed that
Defendant is subject to the ADA, that Plaintiff was disabled, and that he suffered an adverse
employment action when he was terminated.

An employee is "otherwise qualified" for a job if she or he "is able to meet all of a
program's [essential] requirements in spite of [her or] his handicap." Hardy v. Vill. of Piermont,
N.Y., 923 F. Supp. 604, 610 (S.D.N.Y. 1996); see also McMillan, 711 F.3d at 126 (reasoning
that whether an ADA plaintiff is "otherwise qualified" for a job depends on whether the
plaintiff's impairments affect his ability to discharge the "essential functions" of his job). "If the
consequences of [a] handicap are such that [an] employee is not qualified for [a] position, then a
firing because of that handicap is not discriminatory, even though the firing is 'solely by reason
of' the handicap." Howard v. City of New York, 62 F. Supp. 3d 312, 319 (S.D.N.Y. 2014).

As an initial matter, the parties do not appear to agree on exactly which handicap led to
Plaintiff's firing. In the April 7, 2014 Letter, the City stated its intention to "officially terminate
[Plaintiff's] employment" because Plaintiff had been "absent" from work for over a year "as a

result of disability, other than a disability arising from occupational injury or disease." Apr. 7, 2014 Letter. Plaintiff interprets the reference to a "non-occupational disability" to mean that Defendant fired Plaintiff because of his diabetes. Pl.'s Opp'n at 5–6; see also id. at 5 ("Defendant took adverse action upon me based upon the 'non-occupational' disability of diabetes . . . ."). Plaintiff's is not the only reasonable interpretation, however. The Independent Medical Examiner, Dr. Carr, opined that he could not, "with a reasonable degree of medical certainty, place the cause of [Plaintiff's] disc disease" and accompanying back and neck pain "on the incident of March 9, 2008." Hearing Report at 10. Given that Dr. Carr was commissioned by the City to examine Plaintiff and determine the source and seriousness of Plaintiff's neck and back injuries, and given that he did not attribute these injuries to Plaintiff' March 9, 2008 fall, a reasonable interpretation of the April 7, 2014 Letter is that it refers to Plaintiff's neck and back pain—not his diabetes—when discussing a "disability[] other than [that] arising from occupational injury."[9]

In any event, regardless of which disability precipitated Plaintiff's firing, summary judgment is unwarranted. Beginning with Plaintiff's physical injuries, Defendant argues that Plaintiff's neck and back pain rendered him unqualified to be a Utica Police Officer. Def.'s Mem. at 3–8. Defendant relies on Plaintiff's deposition testimony, in which he testified that, at times, severe pain would send him home early from work, he would suffer pain when he carried his duty bag or wore his gun belt and vest, and he could not sit or stand for more than five to ten minutes at a time without feeling pain. Id. at 7 (citing First Hensel Dep. at 92–94, 128–29, 197–99). According to Defendant, this testimony indicates that Plaintiff could not perform essential

_____

[9] Though nowhere in its summary judgment briefing does Defendant state explicitly what injury it referred to in the April 7, 2014 Letter, the briefing does focus on Plaintiff's physical impairments caused by his fall and car accident. See Def.'s Mem. at 2–8.

functions of a police officer such as "[wear]ing a gun belt and vest, go[ing] out onto the street [to patrol,] and chas[ing] down criminals." Id. at 8; see also id. at 6 (arguing that the essential functions of a Utica police officer include "routine patrol tasks," "apprehension of criminals," and other tasks that require "physical strength and agility").

Even assuming that there is no genuinely disputed issue of material fact as to whether these activities are essential functions of a Utica police officer, other record evidence controverts Defendant's argument that Plaintiff was incapable of performing these functions, and precludes summary judgment. First, there is Dr. Carr's opinion, in which he concluded that "Officer Hensel could return to work without restrictions as a police officer." Hearing Report at 10; see also Apr. 16, 2012 Letter ("[Dr. Carr] noted that there was 'no medical contraindication for [Plaintoff working full duty without restrictions as a police officer.'"). Additionally, Dr. Buckley reported Plaintiff's "disability status [as] 50% to 75% overall," Dkt. No. 136-7, Ex. 20, and he testified at the § 207-c Hearings that Plaintiff "could perform some but not all of the duties of" a police officer, Hearing Report at 11. Viewed as a whole, the record thus contains evidence suggesting that Plaintiff's disabilities: (i) completely restricted his ability to perform the essential functions of a police officer, see Dkt. No. 135-6, Ex. 15 (report of Dr. Dang opining that Plaintiff's level of impairment was 100%); (ii) partially restricted his ability, see Hearing Report at 11 (testimony of Dr. Buckley); or (iii) did not restrict him at all, see Hearing Report at 10 (describing views of Dr. Carr).[10] Defendant itself engaged Dr. Carr to examine Plaintiff, Def.'s SMF ¶ 9; it cannot now ignore the results of this exam to say that Plaintiff was indisputably incapable of performing the

---

[10]  Because of this contradictory evidence, there is no need for the Court to decide whether any of the duties potentially impacted by Plaintiff's conditions were "essential" to his role as a Utica police officer. If Plaintiff's conditions did not affect his ability to do his job, as Dr. Carr opined, Plaintiff was then capable of performing all the essential functions of a police officer.

essential functions of a Utica police officer. Thus, the contradictory medical evidence as to the extent of Plaintiff's disability precludes summary judgment.

As for Plaintiff's diabetes, Defendant does not argue that the symptoms of this disability prevented Plaintiff from discharging the essential functions of his job. Nor, on this record, does the Court think that such an argument would likely be successful at this stage. Cf. Jackson v. City of New York, No. 06-CV-1835, 2011 WL 1533471, at *13 (E.D.N.Y. Mar. 3, 2011) (denying summary judgment where defendant argued that the plaintiff's diabetes prevented her from performing the essential functions of a police officer), report and recommendation adopted sub nom. Jackson v. New York, No. 06-CV-1835, 2011 WL 1527935 (E.D.N.Y. Apr. 22, 2011); Bombrys v. City of Toledo, 849 F. Supp. 1210 (N.D. Ohio 1993) (enjoining city from implementing blanket exclusion for persons with insulin-dependent diabetes from employment as police officers). Therefore, regardless of which disability precipitated Plaintiff's firing, there is a genuine dispute of material fact as to whether Plaintiff—despite his disabilities—was otherwise qualified to work as a Utica police officer. Plaintiff has thus met his initial burden to raise a prima facie case of discrimination.

Ordinarily, once a plaintiff establishes a prima facie case of disability discrimination, the burden flips to the defendant under McDonnell Douglas to "offer . . . a legitimate non-discriminatory reason for the [adverse action]." Sista, 445 F.3d at 169. However, in this case, there is no need for the Court to work through the remaining steps of the McDonnell Douglas framework. See McMillan, 711 F.3d at 129 (explaining that McDonnell Douglas is not necessary where "the parties agree that the employer complains of conduct that is the direct result of the employee's disability"). Where, as here, "[D]efendant d[oes] not dispute that . . . [P]laintiff suffered an adverse employment action because of h[is] disability," there is no need to consider

whether Defendant's proffered reason for terminating Plaintiff was pretextual. See Presumey v. Town of Greenwich Bd. of Educ., No. 15-CV-278, 2018 WL 740194, at *6 (D. Conn. Feb. 7, 2018), aff'd sub nom. Presumey v. Bd. of Educ., Town of Greenwich, 770 F. App'x 595 (2d Cir. 2019); see also Hampson v. State Farm Mut. Auto Ins. Co., No. 12-CV-258, 2015 WL 12733387, at *15 (N.D.N.Y. Mar. 26, 2015) ("While Defendant asserted that Plaintiff's absences were the cause of her termination, if Plaintiff's absences were a manifestation of her disability they cannot be separated from the disability itself."). Additionally, because "[t]he Parties do not address the subsequent steps of the McDonnell test in their briefing, . . . the Court [for this reason as well] does not consider those steps at this stage." See Dipinto v. Westchester Cty., No. 18-CV-793, 2019 WL 4142493, at *6 (S.D.N.Y. Aug. 30, 2019).

The Court recognizes that the parties' arguments here seem reversed in some fundamental way, with a Defendant arguing that an ADA plaintiff is seriously disabled and a plaintiff arguing that he is not. The Court also recognizes that these arguments are in tension with the positions the parties took at the § 207-c Hearings. To the Court, these realizations highlight the conflicting medical evidence in this case and confirm the Court's impression that this issue is not suitable for summary judgment. Therefore, the Court denies Defendant's summary judgment Motion as to Plaintiff's discriminatory discharge claim.

### 2. Failure to Accommodate

"Discrimination under the ADA includes 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.'" Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 134 (2d Cir. 2008) (quoting 42 U.S.C. § 12112(b)(5)). A

plaintiff establishes a failure-to-accommodate claim by demonstrating that: "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [plaintiff's] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations. McMillan, 711 F.3d at 125–26.

Defendant argues that "it is entitled to summary judgment on elements two and three of a failure to accommodate claim."[11] Def.'s Mem. at 8. More specifically, Defendant argues that: (1) there is no evidence that Plaintiff was otherwise qualified to perform the essential functions of a Utica police officer even with a reasonable accommodation, id. at 13; and (2) Plaintiff never requested any accommodation and, therefore, cannot satisfy element two's notice requirement, id. at 9–13. The Court addresses these arguments separately.

### a. Otherwise Qualified

The Court dispenses quickly with Defendant's first argument. As described above, the parties' evidence creates a triable issue of fact as to whether Plaintiff was otherwise qualified to work as a Utica police officer, with or without a reasonable accommodation. Therefore, the Court denies summary judgment on these grounds.

### b. Notice

This argument contains two sub-parts and requires more discussion. Defendant first argues that "Plaintiff never requested an accommodation at the time he was terminated, nor

---

[11]  Because Defendant has not challenged the first or fourth elements of Plaintiff's failure-to-accommodate claim, the Court sees no need to address these elements at this time. See Hockenjos v. Metro. Transporation Auth., No. 14-CV-1679, 2016 WL 2903269, at *10 (S.D.N.Y. May 18, 2016) (addressing only the elements of plaintiff's prima facie case challenged in defendant's summary judgment motion), aff'd sub nom. Hockenjos v. MTA Metro-N. R.R., 695 F. App'x 15 (2d Cir. 2017).

[during] the post termination process," and therefore it cannot be liable for refusing to make an accommodation that was never requested.[12] Def.'s Mem. at 11. Defendant then argues that, even if Plaintiff had made such a request, Plaintiff failed to participate in the required "interactive process" that would have determined how to reasonably accommodate his disabilities. Id. at 11–13.

At the outset, the Court notes that, despite Defendant's assertion that these arguments challenge "element two" of Plaintiff's prima facie failure-to-accommodate claim, assertions that a plaintiff failed to request an accommodation or failed to participate in the interactive process are more properly described as arguments that a plaintiff was never denied accommodation. See, e.g., Dooley v. JetBlue Airways Corp., 636 F. App'x 16, 18–19 (2d Cir. 2015) (finding that the plaintiff could not establish the "fourth prong" of the failure-to-accommodate test because she did not allege that she had ever requested the accommodation at issue, noting that "an employer cannot 'refuse [] to make [an] accommodation' . . . that it was never asked to make") (citing McMillan, 711 F.3d at 126); Gray v. Onondaga-Cortland-Madison BOCES, No. 16-CV-973, 2020 WL 1029022, at *9 (N.D.N.Y. Mar. 3, 2020) ("An accommodation request contemplate[s] an ongoing, informal, and interactive process [however] . . . an employer cannot be said to have refused an accommodation if no request was ever made.") (internal quotation marks omitted). Here, there is no dispute that the second element—that "an employer covered by the statute

---

[12] Defendant acknowledges that Plaintiff requested accommodations in 2012, "two years prior to his 2014 termination," but argues that these requests cannot form the basis for a failure-to-accommodate claim because they took place more than 300 days before Plaintiff filed his 2014 complaint with the EEOC. Def.'s Mem. at 11 n. 3. The Court agrees, because "a plaintiff in New York must file a charge with the EEOC within 300 days of the defendant's allegedly unlawful employment act before pursuing an ADA claim in federal court" and "an employer's denial of a requested accommodation does not give rise to a continuing violation" that would otherwise satisfy this requirement. See Francis v. Wyckoff Heights Med. Ctr., 177 F. Supp. 3d 754, 776 (E.D.N.Y. 2016).

[must] ha[ve] notice of [the plaintiff's] disability," McMillan, 711 F.3d at 125–26—is met. See,

e.g., Jan. 19, 2012 Letter (informing Chief Williams about Plaintiff's injuries stemming from his

March 9, 2008 fall). Therefore, the Court construes Defendant's arguments to challenge the

fourth element of Plaintiff's claim.

Turning to the first part of Defendant's argument—that Plaintiff never requested an

accommodation—"generally, it is the responsibility of the individual with a disability to inform

the employer that an accommodation is needed." Costabile v. New York City Health & Hosps.

Corp., No. 18-CV-2816, 2020 WL 890733, at *3 (2d Cir. Feb. 25, 2020) (quoting Graves v.

Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006)). However, there is an exception to this

general rule "where 'the disability is obvious—which is to say, if the employer knew or

reasonably should have known that the employee was disabled.'" Id. (quoting Brady, 531 F.3d at

135).[13] Whether a plaintiff affirmatively requests an accommodation or obviously needs one,

"the [employer's] duty to engage [in] the interactive accommodations process" is "trigger[ed]"

either way. Id.

Here, it is undisputed that Defendant knew Plaintiff was disabled. For example, the April

7, 2014 Letter—notifying Plaintiff that the City intended to fire him—acknowledges Plaintiff's

disability and confirms that Defendant knew about it. See Apr. 7, 2014 Letter; see also Jan. 19,

2012 Letter; First Hensel Dep. at 144–45 (describing Plaintiff's April 2012 phone conversation

---

[13]  Although some courts have stated categorically that "an employer cannot be liable for
failing to provide an accommodation that was never requested," see, e.g., Kho v. New York &
Presbyterian Hosp., 344 F. Supp. 3d 705, 721 (S.D.N.Y. 2018), the Court notes that, under
Brady, this does not appear to be correct, see, e.g., Chesebro v. Town of Guilderland, No. 18-
CV-1294, 2019 WL 3891024, at *8 (N.D.N.Y. Aug. 19, 2019) ("In addition to an employer's
obligation to provide reasonable accommodation for 'disabilities for which accommodation has
been requested[,]' employers also have 'a duty reasonably to accommodate an employee's
disability if the disability is obvious—which is to say, if the employer knew or reasonably should
have known that the employee was disabled.'") (quoting Brady, 531 F.3d at 135).

with Captain Bailey). Therefore, regardless of whether Plaintiff affirmatively requested an accommodation—and despite Defendant's argument that he did not, see Def.'s Mem. at 11— Defendant was "obligated under Brady to initiate [the] interactive accommodation process." Costabile, 2020 WL 890733, at *4 (internal quotation marks omitted); see also Wanamaker v. Town of Westport Bd. of Educ., 11 F. Supp. 3d 51, 78 (D. Conn. 2014) ("Defendant clearly was aware of Plaintiff's disability, and, thus, was under an obligation to engage in an interactive process regarding a reasonable accommodation.").

Turning to the second part of Defendant's argument—that Plaintiff failed to engage in the interactive process—"the ADA envisions a[] . . . process[] by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Noll v. Int'l Bus. Machines Corp., 787 F.3d 89, 98 (2d Cir. 2015); see also Tse v. New York Univ., No. 10-CV-7207, 2016 WL 10907062, at *23 (S.D.N.Y. Aug. 29, 2016) ("[B]ecause [the defendant] was aware of [the plaintiff's] disability, it was required to engage in the 'interactive process' with her to determine if there was a reasonable accommodation and if so, to provide such accommodation."). "The purpose of the interactive process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Sivio v. Vill. Care Max, No. 18-CV-2408, 2020 WL 497513, at *10 (S.D.N.Y. Jan. 31, 2020) (internal quotation marks omitted); see also Novick v. Vill. of Wappingers Falls, N.Y., 376 F. Supp. 3d 318, 337 (S.D.N.Y. 2019) ("[T]he ADA places a duty on employers to ascertain whether there are some jobs that the employee might be qualified for."). However, "if [an] employee [her or himself] causes the interactive process to collapse, an employer will not be liable for failing to make an accommodation under the ADA." Berger v. New York City Police Dep't, 304 F. Supp. 3d 360, 371 (S.D.N.Y. 2018).

Defendant argues that Plaintiff failed to engage in the interactive process and himself caused it to collapse. See Def.'s Mem. at 11–13. Defendant asserts that it attempted to initiate the interactive process when it sent Plaintiff the April 7, 2014 Letter—which gave Plaintiff "the opportunity to submit further medical evidence for review by the Civil Service Commission," Apr. 17, 2014 Letter—but that Plaintiff never responded. Id. at 12. Plaintiff, unsurprisingly, insists that Defendant never initiated the interactive process. Opp'n at 20–21.

Though it is undisputed that, other than filing his Appeal Motion, Plaintiff never responded to the April 7, 2014 Letter, see First Hensel Dep. at 184–85; Def.'s SMF ¶ 22, Defendant has not convinced the Court that its Motion must be granted on this issue. First, it is not clear that the April 7, 2014 Letter actually initiated the interactive process, as Defendant suggests. Although the April 7, 2014 Letter invites Plaintiff to "submit further medical evidence," it does so not in regard to Plaintiff's disability and not in an effort to reach some accommodation as to that disability, but instead to "establish [Plaintiff's] fitness to perform all the duties of a Utica Police Officer." See Apr. 7, 2014 Letter. A reasonable jury could find that this invitation was not the start of "an interactive process by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." See Noll, 787 F.3d at 98. Nor has Defendant pointed to any other pre-termination episode in which it attempted to initiate the interactive process but was rebuffed by Plaintiff. See Def.'s Mem.[14]

---

[14] Defendant also argues that Plaintiff failed to engage in the interactive process when he declined to respond to the May 1, 2014 Letter terminating his employment and declined to apply for reinstatement under Civil Service Law § 73. Def.'s Mem. at 13. However, it does not appear to the Court that initiating the interactive process after terminating an employee satisfies the employer's duties under the ADA. See Webster v. Methodist Occupational Health Centers, Inc., 141 F.3d 1236, 1239 (7th Cir. 1998) ("We . . . do not rely on anything [the defendant] may have done after [the plaintiff's] termination . . . to support . . . its actions."); E.E.O.C. v. Supervalu, Inc., No. 09-CV-5637, 2014 WL 6791853, at *3 (N.D. Ill. Dec. 2, 2014) (finding that the defendant had failed to meet its obligation to engage in the interactive process where "no one

Plaintiff, for his part, attests that he "was never approached by the City of Utica to explore whether or not I could perform the essential functions of a police officer in . . . [a] temporary light duty position." Hensel Aff. at 12. And he asserts that, when he contacted the civil service office "in an effort to save [his] job" the day after receiving the May 1, 2014 Letter, he was told that he was "gone." Id. at 13.

In sum, there is scant evidence in the record that Defendant engaged in the interactive process—as envisioned by the ADA—by "request[ing] information about [Plaintiff's] condition and [his] limitations . . . , ask[ing] [Plaintiff] what he . . . specifically want[ed], show[ing] some sign of having considered [Plaintiff's] request, [or] offer[ing] and discuss[ing] available alternatives [if] [Plaintiff's] request [was] too burdensome."[15] See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 219 (2d Cir. 2001). The record, consequently, raises genuine issues of fact as to which party caused the interactive process to fail and, therefore, as to Plaintiff's prima facie case.

If a plaintiff establishes a prima facie failure-to-accommodate case, the McDonnell Douglas burden-shifting framework ordinarily applies. Garvey v. Town of Clarkstown, N.Y., No. 13-CV-8305, 2018 WL 1026379, at *8 (S.D.N.Y. Feb. 22, 2018), aff'd sub nom. Garvey v. Sullivan, 773 F. App'x 634 (2d Cir. 2019). However, because Defendant does not argue that it

---

contacted [the fired employee] until . . . a month and a half after her termination date"). Additionally, the April 7, 2014 Letter states that Plaintiff could apply for reinstatement "within one (1) year from the end of [his] disability." Apr. 7, 2014 Letter. Such an invitation does not initiate a process by which Plaintiff's disability could be accommodated.

[15] Defendant also argues that it engaged in the interactive process when it transferred Plaintiff back to a full-duty position in 2012 and ordered him back to work. Reply at 8; see also Apr. 16, 2012 Letter. According to Defendant, Plaintiff himself then caused the interactive process to break down by failing to report to work. Reply at 8. However, the Court does not believe that ordering a potentially disabled employee to return to unrestricted duty qualifies as initiating the interactive accommodation process.

had a "legitimate, nondiscriminatory purpose for its allegedly adverse action," as required at step two of the McDonnell Douglas framework, id., the Court ends its analysis here. See King v. Town of Wallkill, 302 F. Supp. 2d 279, 294 (S.D.N.Y. 2004) ("Inasmuch as the parties do not address the other two steps in the burden-shifting analysis, we will refrain from combing the record and making this potentially outcome-determinative decision sua sponte without the assistance of counsel more familiar with the relevant facts.").

The Court therefore denies Defendant's Motion as to the failure-to-accommodate claim.[16]

### 3. *Retaliatory Discharge*

The ADA forbids retaliation against an employee for complaining of prohibited discrimination. 42 U.S.C. § 12203(a). In order to establish a prima facie case of retaliation under the ADA, a plaintiff must show that: "(1) [she or] he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against [her or] him; and (4) a causal connection exists between the alleged adverse action and the protected activity." Caruso v. Camilleri, No. 04-CV-167, 2008 WL 170321, at *2 (W.D.N.Y. Jan. 15, 2008) (citing Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)). "A plaintiff's burden at this prima facie stage is de minimis." See Treglia, 313 F.3d at 719. McDonnell Douglas burden-shifting likewise applies to retaliation claims under the ADA. Terry v. Ashcroft, 335 F.3d 128, 141 (2d Cir. 2003).

---

[16] To the extent Defendant argues that Plaintiff has failed to show that his disabilities could be reasonably accommodated, see Reply at 4–8, the Court declines to address this argument because Defendant first raised it in its Reply. See, e.g., Schuh v. Druckman & Sinel, L.L.P., 602 F. Supp. 2d 454, 465 (S.D.N.Y. 2009) ("Because this argument was made for the first time in the reply brief . . . Plaintiffs have had no opportunity to respond to [it,]" and "[the Court] thus decline[s] to consider it.").

Defendant argues that Plaintiff has failed to raise a triable issue of fact as to the first, second, and fourth elements of his prima facie case. Def.'s Mem. at 14–16. Defendant further argues that, should the Court find that Plaintiff has met his prima facie burden, "Plaintiff's claim still fails under the <u>McDonnell Douglas</u> burden shifting analysis." <u>Id.</u> at 17. The Court first addresses Plaintiff's prima facie case, then the <u>McDonnell Douglas</u> framework.

### a. Prima Facie Case

As a preliminary matter, the parties interpret the contours of Plaintiff's retaliation claim differently. Plaintiff's Amended Complaint alleges that he challenged the denial of his § 207-c benefits "in a series of legal appeals" in which he raised "complaints of . . . disability discrimination." Am. Compl. ¶ 31. The Amended Complaint further alleges that "[i]n retaliation for said complaints of mistreatment . . . the City sent Plaintiff" the April 7, 2014 Letter notifying him of its intent to terminate his employment. Am. Compl. ¶ 32.

By contrast, and relying on Plaintiff's deposition testimony, Defendant asserts that Plaintiff claims his sole protected activity consists of "filing a Motion for leave to appeal to the New York State Court of Appeals." <u>See</u> Def.'s Mem. at 15 (citing First Hensel Dep. at 192; Dkt. No. 135-5 ("Second Hensel Deposition") at 181–82). Defendant also argues that the retaliatory action Plaintiff complains of is the May 1, 2014 Letter from Chief Williams terminating Plaintiff's employment "effective immediately." <u>See</u> <u>id.</u> (citing Second Hensel Dep. at 182 ("There's . . . retaliation especially when I reserved my right to the Court of Appeals, an hour later I'm served with a termination notice . . . .")). Based on this interpretation of Plaintiff's claim, Defendant argues that the evidence fails to raise a triable issue of fact as to elements one, two, and four of Plaintiff's retaliation claim.

However, the Court declines to interpret Plaintiff's claim so narrowly. For one, the Amended Complaint does not limit its retaliation allegations purely to the Appeal Motion and the May 1, 2014 Letter. See Am. Compl. ¶¶ 31–32. Nor is Plaintiff's briefing in response to Defendant's Motion so limited. See Opp'n at 24 ("The complaints I made of discrimination [include]: (1.) my §207-c proceeding, . . . (4.) preserving my right to appeal to the NY Court of Appeals . . . ."). Thus, Defendant's cramped interpretation of this claim—based solely on Plaintiff's deposition testimony—is unavailing, especially where Plaintiff has been representing himself since prior to that deposition.[17] See Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019) (Kahn, J.) ("[W]here a party is proceeding pro se, the court must 'read his supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest.'" (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994))).[18]

Without adopting Defendant's narrow construction of Plaintiff's retaliation claim, Defendant's other arguments regarding the viability of that claim fall away. Defendant argues that Plaintiff's claim fails because the uncontroverted evidence in the record demonstrates that Chief Williams did not have notice of the Appeal Motion when he signed the May 1, 2014 Letter. See Def.'s Mem. at 15 (citing Williams Aff. (attesting that, when Chief Williams issued the May 1, 2014 Letter terminating Plaintiff's employment, he "was not aware that Plaintiff had

---

[17]  The Court granted Plaintiff's counsel's Motion to Withdraw on February 6, 2017. See Docket. Defendant took the First Hensel Deposition on July 10, 2018 and the Second Hensel Deposition on July 17, 2018.

[18]  For this same reason, the Court does not view as conclusive Plaintiff's focus in his briefing on the Appeal Motion and May 1, 2014 Letter. See Opp'n at 24–25 ("The defendant ultimately took adverse action upon me as soon as they received the notice of motion [for leave to appeal] . . . The close proximity between the Notice of Leave to appeal and [the] termination notice, makes it possible to conclude that the real motive to fire me was . . . to retaliate for seeking leave to appeal.").

filed a Motion for Leave to Appeal.")). However, whether Chief Williams had notice of this particular motion before deciding to fire Plaintiff is irrelevant to the question of whether the City had notice of the earlier proceedings in Plaintiff's Article 78 Petition—a fact that Defendant does not dispute. See Fourth Department Decision (issued to the City's Corporation Counsel's Office as counsel for the City); see also Infantolino v. Joint Indus. Bd. of Elec. Indus., 582 F. Supp. 2d 351, 359 (E.D.N.Y. 2008) (finding that plaintiff had stated a prima facie case where court filings constituted protected activity of which defendant was aware). Defendant further argues that Plaintiff cannot establish a reasonable inference of causation because the City initiated termination proceedings against Plaintiff on April 7, 2014, weeks before Plaintiff filed his Appeal Motion. Id. at 16 ("[T]ermination was already commenced[] before Plaintiff filed his Notice of Motion to the Court of Appeals.") (emphasis in original) (citing Apr. 7, 2014 Letter (stating that "[i]t is the City's intention to officially terminate your employment in accordance with Section 73 of the Civil Service Law")). But Defendant's argument is unpersuasive where the City sent the April 7, 2014 Letter after Plaintiff had engaged in other protected activity through prosecuting his Article 78 Petition.

When viewing Plaintiff's retaliation claim appropriately, the record indicates that Plaintiff has raised genuine issues of material fact as to the challenged elements of his prima facie case. First, an Article 78 proceeding can constitute protected activity where, as here, it seeks to redress alleged discriminatory conduct. See Scotti v. Cty. of Nassau, No. 02-CV-3685, 2005 WL 3670913, at *5 (E.D.N.Y. Sept. 13, 2005) (denying summary judgment where the plaintiff alleged he was retaliated against for initiating an Article 78 proceeding); see also First Hensel Dep. at 160–61 ("Q: [A]ll of those reasonable accommodations [you wanted] were prosecuted by you and your attorney through the 207(c) proceeding. Is that true? A: That would

probably -- I would say yes."); Am. Compl. ¶ 31 ("Plaintiff['s] . . . Article 78 appeal . . .

contained Plaintiff's complaints of . . . disability discrimination."). Additionally, as described

above, the City, whose office of the corporation counsel litigated the Article 78 proceeding

against Plaintiff, received notice of filings in this case.

Further, the evidence in the record allows for a reasonable inference of causation, though

a few more words must be said on this issue. "A causal connection in retaliation claims can be

shown either (1) indirectly, by showing that the protected activity was followed closely by

discriminatory treatment, or through other circumstantial evidence such as disparate treatment of

fellow employees who engaged in similar conduct; or (2) directly, through evidence of

retaliatory animus directed against the plaintiff by the defendant." Natofsky v. City of New

York, 921 F.3d 337, 353 (2d Cir. 2019). Here, because Plaintiff has submitted no direct evidence

of retaliatory animus on the part of City decision-makers, he must rely on indirect evidence to

establish causation.

When relying on temporal proximity to indirectly establish causation, "the relevant

date . . . is the date plaintiff last engaged in protected activity." Infantolino, 582 F. Supp. 2d at

359. In this case, Plaintiff's last documented protected act prior to termination was filing his

Appeal Motion on April 29, 2014. However, as described above, Chief Williams attests that,

when he issued the May 1, 2014 Letter terminating Plaintiff's employment, he "was not aware

that Plaintiff had filed a Motion for Leave to Appeal." Williams Aff. Therefore, Chief Williams

could not have decided to fire Plaintiff in retaliation for filing the Appeal Motion, see Heilweil v.

Mount Sinai Hosp., 32 F.3d 718, 725 (2d Cir. 1994) ("[A]n employer is only responsible for

employment decisions based on information available to it when it decides."), and the Appeal

Motion cannot serve as the predicate protected activity necessary to establish causation. Prior to

filing the Appeal Motion, however, Plaintiff filed his Article 78 Petition in Oneida County

Supreme Court to contest the cancellation of his 207-c benefits. See First Hensel Dep. at 174;

Hensel Aff. at 11–12; see also Opp'n at 24 (listing Plaintiff's "§207-c proceeding" as a protected

activity). Plaintiff filed this Petition on June 18, 2013. See Hensel v. City of Utica,

1301219/2013, Dkt. No. 1, (Filed June 18, 2013). Thus, Plaintiff's last protected act took place

nearly ten months before the City's April 7, 2014 decision to initiate termination proceedings

against him, and over ten months before the City fired him on May 1, 2014.

"While there is no bright-line rule for what interval of time may help to establish a causal

relationship," Hampson, 2015 WL 12733387, at *20, some courts have advanced a general rule

that "passage of more than two months between the protected activity and the adverse

employment action does not allow for an inference of causation," Garrett v. Garden City Hotel,

Inc., No. 05-CV-962, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (collecting cases); see

also McGuire v. Warren, No. 05-CV-2632, 2009 WL 3963941, at *12 (S.D.N.Y. Nov. 18, 2009)

("[M]any district courts in this Circuit . . . have declined to infer a causal relationship when more

than two months had lapsed between the instance of protected activity and the allegedly

retaliatory act."). However, this general rule does not apply when a plaintiff has other evidence

suggesting retaliatory intent. See McGuire, 2009 WL 3963941, at *12 (distinguishing situations

in which the two-month rule did apply—where a causal connection was exclusively based on

temporal proximity—from situations in which the two-month rule did not apply—where the

causal connection was supplemented with other evidence in the record) (citing Cioffi v. Averill

Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 168 (2d Cir. 2006) ("several months" does not

defeat causal inference in the presence of additional support); Grant v. Bethlehem Steel Corp.,

622 F.2d 43, 45–46 (2d Cir. 2008) (eight month time lapse does not defeat causal inference);

Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty., 252 F.3d 545, 555 (2d Cir. 2001) (five month difference does not defeat causal inference where additional evidence exists to support the inference); Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009) (six-month time difference between protected activity and adverse consequence does not defeat causal inference where inference is plausible on other grounds)).

In this case, Plaintiff has supplied sufficient additional evidence to support a causal inference in the form of affidavits from several former UPD colleagues. In particular, John Martello, a retired UPD sergeant and former secretary of the Police Benevolent Association—"the sole bargaining unit for members of the department"—stated that he was "not aware of any other [officer] who has been or ever was terminated while attempting to obtain a 207-c designation." Dkt. No. 154-1, Ex. 11 ("Martello Affidavit") at 2. Similarly, former UPD Sergeant and union official Louis Ruggiero stated that "Officer Hensel's case is unique[;]" "he is the only officer I am aware of who . . . had his 207-c benefits, health insurance, and ultimately employment terminated" in this manner. Dkt. No. 154-1, Ex. 10 ("Ruggiero Affidavit") at 1–3. This evidence helps establish the causation element of a retaliation claim, see Natofsky, 921 F.3d at 353 (explaining that "disparate treatment of fellow employees who engaged in similar conduct" is circumstantial evidence of a "causal connection in retaliation claims"), and allows for a reasonable inference of causation despite the ten-month time gap in this case, see Bernhardt v. Interbank of New York, 18 F. Supp. 2d 218, 226 (E.D.N.Y. 1998) (eleven-month time lapse does not defeat causal inference in presence of additional support), amended on other grounds by No. 92-CV-4550, 2009 WL 255992 (E.D.N.Y. Feb. 3, 2009); cf. Raniola v. Bratton, 243 F.3d 610, 625–27 (2d Cir. 2001) (concluding that fourteen months between EEOC complaint and employee's termination satisfied the timing element in Title VII retaliation case).

Therefore, the Court finds that Plaintiff has met, if barely, the de minimis burden necessary to raise triable issues of fact as to his prima facie retaliation claim. See Treglia, 313 F.3d at 719 ("A plaintiff's burden at this prima facie stage is de minimis."). Accordingly, the Court turns to Defendant's arguments on the latter steps of the McDonnell Douglas framework.

### b.  McDonnell Douglas

Under the McDonnell Douglas burden-shifting framework, "[o]nce a plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the challenged employment decision." Hart v. City of Johnstown, No. 16-CV-619, 2019 WL 1385612, at *16 (N.D.N.Y. Mar. 27, 2019). "If a defendant meets this burden, the plaintiff must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Id. (internal quotation marks omitted).

Defendant argues that "it is clear that Plaintiff was terminated because he failed to show up for work,"[19] and the burden should, thus, shift to back to Plaintiff to present evidence showing that Defendant's stated reason is pretextual. Def.'s Mem. at 17. The Court agrees that this non-retaliatory reason is sufficient to satisfy Defendant's burden at this step of the McDonnell Douglas framework. Cf. Hatter v. Fulton, No. 92-CV-6065, 1997 WL 411623, at *7 (S.D.N.Y. July 21, 1997) (finding that a public employer's explanation for firing an employee—termination pursuant to New York Civil Service Law § 71 because plaintiff had not returned to work in over a year—satisfied its burden at step two of McDonnell Douglas), aff'd sub nom. Hatter v. New

---

[19] Defendant's statement is not quite complete. The full explanation for Plaintiff's discharge reads: "Dear Mr. Hensel[,] [a]s you know you have been continuously absent from your employment with the City of Utica for a period well in excess of one year, as a result of disability, other than a disability arising from occupational injury or disease as defined by the law. It is the City's intention to officially terminate your employment . . . ." Apr. 7, 2014 Letter.

York City Hous. Auth., 165 F.3d 14 (2d Cir. 1998). The burden therefore flips back to the Plaintiff to put forth evidence that Defendant's proffered justification is pretextual.

Plaintiff has produced sufficient evidence of pretext to preclude summary judgment. First, the affidavits of Plaintiff's former UPD colleagues, described above, constitute evidence that Plaintiff was singled out by Defendant. See Martello Aff. at 2; Ruggiero Aff. at 1–3. Such evidence is probative of pretext. See DeAngelo v. Yellowbook Inc., 105 F. Supp. 3d 166, 178–79 (D. Conn. 2015) (examining evidence that the defendant declined to "discipline[] other employees for engaging in [behavior] identical or similar" to the plaintiff and finding that "[a] reasonable jury may consider this evidence sufficient to find that the articulated reason for [the plaintiff's] termination was pretextual"). Additionally, according to former Lieutenant Pruitt, several UPD officers made comments suggesting hostility toward Plaintiff and his need for accommodations related to his disability. See Pruitt Aff. at 1 ("On numerous occasions I would hear comments from a sergeant (Mike D'Ambro) or my supervisor (Capt. John Toomey) that I was over accommodating with Hensel's disabilities . . . ."). This sort of evidence is also probative of pretext. See Treglia, 313 F.3d at 721 (treating statements by senior police officials that tended to show animosity toward the plaintiff as evidence of pretext and retaliatory motive). Likewise, retired Sergeant Ruggiero attests that the UPD violated its own policies in its dealings with Plaintiff, designating Plaintiff AWOL without first checking on his well-being and ordering him back to work. See Ruggiero Aff. at 3. Violations of employer policies with regard to a plaintiff-employee also suggest an impermissible retaliatory motive. See, e.g., Infantolino, 582 F. Supp. 2d at 361 (violations of protocol in defendant's dealings with plaintiff "support a conclusion that [the defendant's] asserted reason was actually a pretext"). In light of this

evidence, Plaintiff has met his burden on step three of the <u>McDonnell Douglas</u> framework, and the Court denies Defendant's Motion as to the retaliation claim.

## B.  Title VII Claims

In addition to bringing claims under the [ADA], the Amended Complaint also purports to bring claims under Title VII. <u>See</u> Am. Compl. at 1 ("This is an action under Title I of the [ADA] and Title VII of the Civil Rights Act of 1964 . . . ."). However, the Amended Complaint—as well as Plaintiff's summary judgment briefing—contains no allegations that Plaintiff is a member of one of the groups protected by Title VII. <u>See generally</u> <u>id.</u>; Opp'n; <u>see also</u> 42 U.S.C. § 2000e-2 (prohibiting discriminatory employment practices on the basis of "race, color, religion, sex, or national origin"). Title VII does not prohibit discrimination or retaliation on the basis of disability. <u>See</u> <u>Chiesa v. New York State Dep't of Labor</u>, 638 F. Supp. 2d 316, 324 (N.D.N.Y. 2009) ("While . . . Title VII prohibits numerous forms of employment discrimination, the discrimination must be caused by one of the characteristics mentioned in [the statute].")). Therefore, because "[a]ll of [Plaintiff's] alleged protected activities pertain to his disability . . . [he] fails to allege any facts that give rise to a Title VII . . . claim." <u>Laface v. E. Suffolk Boces</u>, 349 F. Supp. 3d 126, 152 (E.D.N.Y. 2018). The Court thus dismisses this claim sua sponte. <u>Cf.</u> <u>Risco v. McHugh</u>, 868 F. Supp. 2d 75, 107, 107 n.45 (S.D.N.Y. 2012) (on summary judgment, dismissing ADA claims sua sponte where plaintiff's complaint "only allege[d] violations of Title VII[,]" and noting that "[t]he Second Circuit has recognized that . . . 'a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.'") (citing <u>Schwartz v. Compagnie Gen. Transatlantique</u>, 405 F.2d 270, 273 (2d Cir. 1968)).

## V.   CONCLUSION

The Court is unsure whether Plaintiff will prevail at trial. However, at this stage, the record raises sufficient factual questions that Plaintiff must have the opportunity to try.

Accordingly, it is hereby:

**ORDERED**, that Defendant's motion for summary judgment (Dkt. No. 135) is **DENIED in its entirety**; and it is further

**ORDERED**, that Plaintiff's Title VII claim is **DISMISSED** sua sponte; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:      March 25, 2020
            Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge